C. A. Lux [1] v. Commissioner. Charles A. Lux [1] v. Commissioner. Lux v. Commissioner
Docket Nos. 44653, 46844.
United States Tax Court
T.C. Memo 1954-107; 1954 Tax Ct. Memo LEXIS 139; 13 T.C.M. (CCH) 691; T.C.M. (RIA) 54213; July 28, 1954, Filed *139 Petitioner was engaged in a gambling enterprise with his father-in-law during the years beginning June 4, 1945 through 1949. Held: (1) Petitioner was an employee in the enterprise, not a partner or coadventurer. His income was, except for certain adjustments, properly reconstructed by respondent pursuant to the bank deposits and expenditures method for 1945 and 1946, and from information derived from the gambling enterprise's books and records and other evidence for 1947, 1948, and 1949. (2) Petitioner's deficiencies for 1945 and 1946 were due, in part, to fraud with intent to evade taxes. Deficiencies for 1947, 1948, and 1949 were not due to fraud with intent to evade taxes. (3) Petitioner failed to file declarations of estimated tax for 1945 through 1949. On account of the amounts of his income not reaching the required amounts, he was not required to file such declarations for 1945, 1946, 1948, and 1949, but was required to so file for the taxable year 1947. Consequently, he is liable for penalties under I.R.C. sections 294(a)(1)(A) and 294(d)(2) for the taxable year 1947. G. E. Fuller, 20 T.C. 308, followed. (4) As a result of petitioner's fraud, assessment of deficiencies and *140 penalties for 1945 and 1946 is not barred by the statute of limitations, section 276(a), I.R.C. Assessment for 1947 may be made under the five-year statute of limitations, section 275(c), I.R.C. Assessment of any deficiency for the year 1948 is barred by the three-year statute of limitations, section 275(a), I.R.C. No claim is made that the statute of limitations bars 1949. Eugene E. Gilmer, Esq., 736 Frank Nelson Building, Birmingham, Ala., and Morel Montgomery, Esq., for the petitioner. Fred T. Carney, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income taxes, and asserted penalties as follows: 50% Fraud
Estimated Tax Penalties
Docket
Penalty
Sec.
Number
Year
Deficiency
(Sec. 293(b))
294(d)(1)(A)
Sec. 294(d)(2)
46844
1945
$1,040.00
$ 520.00
$ 48.10
$ 80.16
46844
1946
2,843.30
1,421.65
313.44
188.06
44653
1947
1,122.08
561.04
126.80
76.08
44653
1948
2,690.90
1,345.45
273.08
163.85
46844
1949
868.09
434.05
113.80
68.29 The issues for decision are: (1) Whether the Commissioner erred in his reconstruction of petitioner's income for the tax years in question and his determination of income tax deficiencies on the basis thereof. (2) Whether *141 any part of petitioner's deficiencies resulted from fraud with intent to evade tax. (3) Whether the Commissioner erred in determining penalties under sections 294(d)(1)(A) and 294(d)(2), Internal Revenue Code. (4) Whether the assessment of deficiencies and penalties for 1945, 1946, 1947, and 1948 is barred by the statute of limitations (section 275(a), I.R.C.). Findings of Fact Petitioner is an individual who, during the years in issue, resided in Birmingham, Alabama, and filed his income tax returns with the Collector of Internal Revenue for the District of Alabama. He is married to Sethyl Lee Lux (hereinafter referred to as Sethyl) who was a niece of H. M. McCoy and was legally adopted at an early age by McCoy, following the death of her mother. Sethyl's last name was changed to McCoy, she was reared by McCoy as his own daughter, and a strong bond of affection existed between them. In fact, petitioner and Sethyl named their son after McCoy. During the years in issue Sethyl did not work either for McCoy or anyone else. McCoy died between the close of the last tax year here in issue and the date of the hearing in this case. 1945 Petitioner was employed by the Bechtel-McCone Corporation, *142 Birmingham, Alabama, until June 4, 1945, earning $2,257.48 in total wages up to that date. After leaving that job he devoted all his time to working for his father-in-law, McCoy, who ran an illegal gambling house in Shelby County, Alabama, one of the major activities of which consisted of a crap game. Petioner's duties included collecting checks for McCoy, making bank deposits, calling on customers, and performing any other tasks that might be assigned. For these services McCoy paid him varying sums of money from time to time. No daily wages or weekly or monthly salary were paid to him. Petitioner maintained no books or records concerning his income for 1945. He had a personal checking account in the Exchange Bank of Birmingham, to which he made the following deposits (all in cash, with the two exceptions noted) in 1945: Date
Amount
May 9
$ 450.00
June 6
333.19 (Check from Bechtel-
McCone Corporation)
June 7
250.00 (Including $25 check
from J. Andrews)
July 10
500.00
July 31
300.00
Aug. 28
150.00
Sept. 10
250.00
Oct. 1
700.00
Oct. 4
200.00
Nov. 20
250.00
Total
$3,383.19 All but the first three of those deposits, a total of $2,350, represented compensation paid to petitioner by McCoy. Sethyl maintained a bank *143 account in the Exchange Bank and deposited $2,489.50 thereto in 1945. Those deposits represented gifts to Sethyl by McCoy and not income to petitioner. Petitioner and Sethyl owned a house with the title in Sethyl's name. Mortgage payments of $36.94 per month in currency were made thereon in 1945 from money earned by petitioner. The payments for the first 5 months were made with petitioner's wages from Bechtel-McCone Corporation. The payments for the remaining 7 months, totaling $258.58, were made with part of petitioner's earnings from McCoy which were not deposited in the bank by petitioner and therefore are not reflected in the aforementioned deposits. Petitioner purchased $487.50 in United States bonds all in the names of his two children. A portion of those bonds was purchased from his wages at Bechtel-McCone Corporation. The remainder was purchased with funds given by McCoy and directed to be used for that purpose. Those funds constituted gifts to petitioner's children from McCoy and not income to petitioner. Petitioner's income for 1945 was composed of the following items: Wages from Bechtel-McCone Cor-
poration
$2,257.48
Earnings from McCoy reflected in
bank deposits
2,350.00
Earnings from McCoy expended
to meet mortgage payments
258.58
$4,866.06
The *144 only return filed by petitioner for 1945 was his Form W-2 from Bechtel-McCone Corporation, reporting wages received and the withholding of $291.30 in income tax. This form was filed by the petitioner on January 14, 1946. The deficiency notice applicable to 1945 was mailed on January 8, 1953. 1946 Petitioner worked full time for McCoy in 1946 performing the same duties as in the last 7 months of 1945. He was to get between 15 and 25 per cent of the net profits of McCoy's business and was guaranteed at least $3,000 for the year. His tax return for 1946 reported $3,924.09 in "partnership" income and a tax thereon of $291. The return was prepared by an accountant from information supplied by McCoy. Petitioner maintained no books or records concerning his income for 1946. Petitioner deposited $750 to his checking account during 1946 and Sethyl deposited $1,050 to her account. Mortgage payments of $443.28 in currency were made on their home during the year. Sethyl's deposits represented gifts to her from McCoy and petitioner's deposits and the mortgage payments were from his earnings but were reflected in the income reported on his return. On July 15, 1946, petitioner purchased a new 1946 *145 Ford Super De Luxe convertible coupe for $1,422.34 in cash, which money was furnished him by McCoy. On September 11 he traded in that car, adding to it $780.49 in cash also furnished him by McCoy, for a new 1946 Ford Super De Luxe Sportsman's convertible coupe. Both cars were for petitioner's personal use. Neither the $1,422.34 nor $780.49 furnished petitioner by McCoy was reported as income. Those sums constituted compensation to petitioner for his participation in McCoy's business and were income properly reportable in 1946. In May McCoy purchased a new 1946 Nash for Sethyl, paying therefore $1,288.79 in cash. This was a gift to Sethyl and not income to petitioner. Petitioner endorsed and cashed an $8,500 check, payable to "cash" and signed by McCoy, sometime during 1946. This check was cashed for McCoy. The proceeds thereof were turned over to McCoy by petitioner and were not part of petitioner's income. Petitioner's entire income for 1946 represented wages earned in McCoy's employ. Petitioner had no proprietary interest in McCoy's business or control over it, McCoy could terminate petitioner's employment at any time, and the amount of money received by petitioner was entirely dependent *146 on McCoy's will. Petitioner's 1946 income was composed of the following items: Received from McCoy and re-
ported in return
$3,924.09
Received from McCoy for 1946
Ford Convertible
1,422.34
Received from McCoy for 1946
Ford Sportsman's Convertible
780.49
$6,126.92
Petitioner's return for 1946 was filed on February 6, 1947. The deficiency notice applicable to 1946 was mailed on January 8, 1953. 1947 Petitioner's return for 1947 reported gross income of $3,085.05 and tax of $146. He maintained no adequate books or records concerning his income for that year. The return was prepared by an accountant from information supplied by McCoy. A statement attached to the return indicated the source of the reported income as follows: H. M. McCoy
Total Receipts
$13,212.00
Less: Expenses
Salaries
$5,190.00
Payroll Tax
51.90
Lights and Telephone
1,800.00
7,041.90
Net Profit
$ 6,170.10
Distribution
H. M. McCoy
$ 3,085.05
Charles A. Lux
3,085.05
Total
$ 6,170.10 There was no evidence of any written or oral agreement between petitioner and McCoy having the characteristics of a partnership or joint venture agreement. Nor was a partnership return filed for 1947. As in prior years, the crap game was one of the major activities conducted *147 by the gambling house and petitioner's duties were similar to those performed for McCoy in 1945 and 1946. The entire bankroll for the gambling operation was supplied by McCoy and there is no evidence of any change in McCoy's ownership of the operation's physical assets. It was understood that petitioner was to receive as compensation a percentage of the net income of the operation remaining after McCoy recovered the amounts he supplied the bankroll. On the other hand, petitioner was not obligated to contribute funds to meet any net loss suffered. The amounts and times of withdrawals of profits from the operation, as well as the amounts and times of distributions made to petitioner from those withdrawals, were entirely within McCoy's control. Finally, McCoy could at any time terminate business relations with petitioner without, as a consequence, having to distribute any part of the operation's assets to him. A record, referred to as the dice book, was maintained showing the operations of the crap game. Petitioner was familiar with the dice book and often made entries therein. The dice book recorded the cash amounts added to the bankroll from time to time and the cash amounts withdrawn *148 therefrom. It is the difference between the totals of those bankroll addition and withdrawal entries which equals the $13,212 reported as "Total Receipts" in petitioner's return. All the expenses of the operation were deducted in the dice book daily, as they were paid; none were accrued to be deducted at the year's end. Consequently, the aforementioned $13,212 actually represented net income from the operation and the $7,041.90 deducted therefrom as expenses in petitioner's return constituted a double deduction of those expenses. The record contains no evidence substantiating petitioner's contention that the $7,041.90 represented expenses incurred in addition to those expenses deducted daily throughout the year. We further find that $6,606, which is 50 per cent of the $13,212 net income earned by the business in 1947, constituted petitioner's wages from McCoy for that year. On January 17, 1947, petitioner rolled dice with James Ayres for the following stakes: if Ayres won, previous unpaid gambling losses to petitioner would be canceled; if petitioner won, the full account between him and Ayres would be settled by each one transferring his automobile to the other. Petitioner won and *149 Ayres thereupon transferred his 1946 Chrysler Town and Country car purchased for $4,000 on January 11, 1947, to petitioner. Petitioner, in turn transferred his 1946 Ford, purchased for $2,058.16 on November 11, 1946, to Ayres. Respondent determined that petitioner realized a gambling gain of $1,797.17 on the transaction which was income to him in 1947. The amount of the gain was computed as the difference between the $4,000 purchase price of the Chrysler and $2,202.83 (the $2,058.16 purchase price of the Ford plus certain additional expenditures made thereon by petitioner). Petitioner's income for 1947 was composed of the following items: Compensation paid by McCoy
(equal to 50 per cent of net
income from the gambling
operation)
$6,606.00
Gambling gain on transfer of
Ford for Chrysler
1,797.17
$8,403.17
Petitioner's return for 1947 was prepared by an accountant employed by McCoy from information furnished by McCoy and was filed on February 4, 1948. The deficiency notice applicable to 1947 was mailed on July 28, 1952. 1948-1949 Petitioner's returns for 1948 and 1949 were prepared by an accountant from information supplied by McCoy. He maintained no adequate books or records concerning his income *150 for those years. The 1948 return reported gross income of $2,935.90 and a tax of $40. A statement attached to that return indicated the source of the reported income as follows: Total Receipts - Net
$15,183.00
Less: Expenses
Lights and Telephone
$1,800.00
Salaries
4,530.00
Payroll Tax
45.30
6,375.30
Net Profit
$ 8,807.70
Distribution
H. M. McCoy
$2,935.90
Charles A. Lux
2,935.90
Jack Lux
2,935.90
Total
$ 8,807.70
The Commissioner in his determination of the deficiency for 1948 added to the adjusted gross income of $2,935.90, reported on petitioner's return, additional income of $11,743.10, which he described in the deficiency notice as follows: "One-third profit from 'Horse
Book'
$10,089.00
Daily salary, 306 days @ $15.00
4,590.00
Total Income for 1948
$14,679.00
Less income reported on orig-
inal return
2,935.90
Additional Income
$11,743.10" The 1949 return reported gross income of $4,450 and a tax of $270. The source of that income was labeled "Entertainment" but no further explanation or breakdown thereof was included. This $4,450 was from the operation of both the horse book and the crap game. In his determination of the deficiency for 1949, the Commissioner has added to the $4,450 reported by petitioner on his *151 return, $4,695.33. He has explained the addition of this $4,695.33 in his deficiency notice as follows: "The taxpayer's income for 1949 consisted of one-third of the profit from the operation of a 'Horse Book' plus a fifteen dollar daily salary from H. M. McCoy. It has been determined that the business operated 313 days during 1949. The records of the 'Horse Book' indicate a total net profit for the year of $13,351.00, one-third of which is income to Charles A. Lux. "One-third profit from 'Horse
Book'
$4,450.33
Daily salary - 313 days @ $15.00
4,695.00
Total Income for 1949
$9,145.33
Less Income reported on orig-
inal return
4,450.00
Additional Income
$4,695.33"
In 1948, McCoy added a horse book to his gamibling operation and placed its management entirely in the hands of petitioner's brother, Jack Lux. Petitioner's duties in 1948 and 1949 were similar to those performed for McCoy in prior years. A bank account was maintained in the name of the business and petitioner and Jack Lux, as well as McCoy, had authority to draw checks thereon. There was no evidence of any written or oral agreement between petitioner, Jack Lux and McCoy having the characteristics of a partnership or joint venture agreement. *152 Nor was a partnership return filed for 1948 or 1949. The entire bankroll for the crap game and horse book was supplied by McCoy and there is no evidence of any change in McCoy's ownership of the operation's physical assets. Neither petitioner nor Jack Lux was obligated to contribute funds to meet any net loss suffered. The amounts and times of withdrawals of profits from the operation, as well as the amounts and times of net income distributions made to petitioner and Jack Lux from those withdrawals, were entirely within McCoy's control. Finally, McCoy could at any time terminate business relations with petitioner and Jack Lux without, as a consequence, having to distribute any part of the operation's assets to them. A record referred to as the dice book was maintained for the crap game. Petitioner was familiar with the dice book and often made entries therein. For the horse book a ledger was maintained and, also, daily report sheets. Jack Lux was in complete charge of the horse book records and made almost all of the entries therein. Both the crap game and horse book records were maintained in the same manner. Expenses were deducted for the most part daily, as they were paid. Some *153 expenses, however, in 1948 were left for deduction at the end of the year. Entries also recorded the cash amounts added to the bankroll of each activity from time to time and the cash amounts withdrawn therefrom. The difference, in 1948, between the total additions to the horse book bankroll and the total withdrawals equaled $30,267. However, a loss of $15,084 was suffered in the operation of the crap game. Consequently, the income realized from the entire operation before the deduction of certain expenses was $15,183 - which is the figure reported as "Total Receipts - Net" in the statement accompanying petitioner's 1948 return. As shown in our findings, the net income for 1948 from the entire crap game and horse book operation, after the deduction of certain expenses, was $8,807.70. Petitioner's one-third share thereof was $2,935.90, which was income properly reportable by him in 1948. This amount was reported in his return for 1948. In 1949, the horse book ledger shows that cash withdrawals exceeded additions to the bankroll by $13,351. Petitioner's one-third share of this equaled $4,450.33 and, in fact, he reported as income $4,450. This has already been shown in our explanation *154 of the adjustments which the Commissioner made to the income which petitioner reported in his 1949 return. It was not claimed by petitioner that any expense be deducted from the $13,351. Nor was any claim made, either by petitioner or respondent, that the $13,351 be increased or decreased to reflect profit or loss from the crap game. Petitioner's share of the gambling operation's net income for 1949, received as compensation by him and properly reportable on his return, was $4,450.33. Petitioner's income was $2,935.90 for 1948 and $4,450.33 for 1949, and represented wages paid to him on a percentage basis. Petitioner's return for 1948 was filed on January 21, 1949, and the deficiency notice applicable thereto was mailed on July 28, 1952. Petitioner's return for 1949 was filed on February 23, 1950, and the deficiency notice applicable thereto was mailed on January 8, 1953. Penalties Except for the aforementioned $1,797.17 gambling gain realized in 1947 by the transfer of his Ford for a Chrysler, all of petitioner's income for the years 1945 through 1949 was derived from wages. In other words, it represented remuneration for personal services performed for his employers: Bechtel-McCone *155 Corporation (until June 4, 1945) and, thereafter, H. M. McCoy. For the tax years in issue petitioner claimed, and was entitled to, dependency exemptions under section 25(b) of the Code for himself, his wife, and two minor children. Taxes were never withheld from the wages earned by him except those earned while employed by the Bechtel-McCone Corporation in 1945. Petitioner failed to file declarations of estimated tax for any of the years in issue or to pay installments of estimated tax. His failure to file such declaration for 1947 was not due to reasonable cause but was due to willful neglect. Petitioner's deficiencies in income taxes for the years 1945 and 1946 were due, in part, to fraud with intent to evade tax. Petitioner's deficiencies in income taxes for the years 1947, 1948, and 1949 were not due to fraud with intent to evade tax. Opinion BLACK, Judge: Deficiencies Respondent determined petitioner's income for 1945 and 1946 pursuant to the so-called bank deposits and expenditures method. For 1947, 1948, and 1949 respondent recomputed petitioner's income from the books and records of the H. M. McCoy gambling enterprise, such as they were, and by resort to certain other evidence. *156 No adequate books or records concerning his income for 1945 through 1949 were maintained by petitioner. We find authority for respondent's action in Louis Halle, 7 T.C. 245, affd. (C.A. 2) 175 Fed. (2d) 500, certiorari denied 338 U.S. 949, wherein we said, at pages 249 and 250: "The Commissioner need not accept, as complete, correct, and accurate, the returns filed or the sworn statement of the taxpayer that his returns completely and correctly disclose his tax liability. The Commissioner has authority to check the returns against the records of the taxpayer and, if no records have been kept or if the records are incomplete, inaccurate, or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law. Estate of Robert Lyons Hague, 45 B.T.A. 104; affd. 132 Fed. (2d) 775." See also Boyett v. Commissioner (C.A. 5), 204 Fed. (2d) 205, affirming Tax Court Memorandum Opinion [10 TCM 237]. 1945-1946 In 1945, petitioner worked for the Bechtel-McCone Corporation until June 4, earning $2,257.48 in wages which is all the income he reported for 1945. He left that job to work for H. M. McCoy, his father-in-law, aiding *157 in the latter's gambling enterprise. Two days after leaving Bechtel-McCone petitioner deposited a check from that corporation in his personal checking account. Thereafter, he made eight more deposits to his account in 1945, totaling $2,600. Of these amounts which petitioner deposited in his bank account we have found that $2,350 represented wages which he received from McCoy. [2] *158 We have also found that $258.50 in mortgage payments on Sethyl's house from June through December 1945, were made with earnings received from McCoy and were neither reported as income nor reflected in petitioner's aforementioned bank deposits. During 1945, petitioner purchased $487.50 in United States bonds in the names of his two children, partially with funds earned at Bechtel-McCone and partially with money McCoy gave him specifically for that purpose. Moreover, petitioner's wife Sethyl deposited $2,489.50 in her own bank account during 1945, which money she received from McCoy. McCoy reared Sethyl as his own daughter and was strongly attached to her and to her children, one of whom was named after McCoy. Sethyl did not perform any services for McCoy in any of the tax years in issue. We think there is sufficient evidence that McCoy's intent was to make gifts both of the bonds purchased for the children with his money and the sums deposited in Sethyl's account. Since the grantor's intent is the controlling factor, we here hold in accordance therewith. Cf. *159 Alice M. Macfarlane, 19 T.C. 9. Those items, consequently, do not represent income to petitioner. Petitioner worked for McCoy during all of 1946, performing the same duties as he did in 1945. He was paid $3,924.09 in percentage of profits wages for that work, which was partially reflected in bank deposits totaling $750 and mortgage payments of $443.28 during the year. He reported the $3,924.09 as income. In addition, McCoy paid petitioner $1,422.34 in July with which to purchase a Ford automobile for his personal use, and paid petitioner $780.49 in September to be used (along with a trade-in of the first car) to purchase a second Ford. Petitioner claims, in his testimony at the hearing, that the money furnished him by McCoy with which to purchase these automobiles was gifts and not part of the compensation which McCoy paid him. Notwithstanding this testimony of petitioner, we have found from a consideration of all the evidence that the cash paid petitioner for the two cars was compensation for services performed for McCoy and, as such, was reportable as income. On the other hand, we have found that the funds from an $8,500 check cashed by petitioner were turned over to McCoy and *160 did not, as respondent has determined, represent income to petitioner. Sethyl made deposits to her bank account of money given her by McCoy totaling $1,050 during 1946. McCoy also purchased for her a new Nash automobile at a price of $1,288.79. Those items were, just as those given in 1945, gifts to her from McCoy and not reportable as income by petitioner. 1947, 1948, and 1949 For the tax year 1947, petitioner's return indicated on its face that he and McCoy were engaged in a joint venture or partnership, and in 1948 and 1949, his returns indicated that they were joined in such enterprise by Jack Lux, petitioner's brother. However, such entries are not controlling in determining if a partnership or joint venture really existed. Estate of E. A. Wickham, 22 B.T.A. 1393, affd. (C.A. 8) 65 Fed. (2d) 527. Whether or not a partnership exists depends upon the intent of the parties, which is a question of fact. In Commissioner v. Tower, 327 U.S. 280, the Supreme Court defined a partnership and enunciated the intent test, as follows: "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, *161 or business and when there is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. An their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.'" * * * And in Commissioner v. Culbertson, 337 U.S. 733, the same Court stated: "The question is * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." The existence of a joint venture, similarly, is determined *162 by the intent of the parties. Lucia Chase Ewing, 20 T.C. 216, 230, affd. on another issue (C.A. 2), Fed. (2d) , May 28, 1954. In that case, too, this Court said that a joint venture "has been defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation', and also as 'an association of persons to carry out a single business enterprise for profit'." The facts bearing on this question are as follows: There was no evidence of any partnership or joint venture agreement or understanding between McCoy and petitioner. McCoy supplied the entire bankroll for the gambling operation and was personally to bear all losses that might be realized. He had complete control over the amounts and times of distributions of earnings of the operation. It appears that he owned all the physical assets of the operation and that petitioner had no proprietary interest therein. Moreover, McCoy could dispense with petitioner's services at any time without a consequent distribution of the operation's assets. McCoy supplied an accountant with all the information upon which to base the returns of himself, *163 petitioner and Jack Lux and no partnership returns were filed for the years in issue. An examination of these facts convinces us that the requisite intent to form a partnership or joint venture in 1947, 1948 or 1949 was lacking and, consequently, no such business structure existed. Rather, the relationship between McCoy and petitioner was that of employer-employee, the latter receiving compensation measured, in part, by a percentage of the net profits. Lucia Chase Ewing, supra; Isadore Louis Rosenberg, 15 T.C. 1; Plains Realty Co., 31 B.T.A. 412. In our Findings of Fact we have found the respective amounts of petitioner's share in the profits of McCoy's gambling operations for 1947, 1948, and 1949 as wages for his services to McCoy and these amounts should be included in his income in a recomputation under Rule 50. Petitioner realized another item of income in 1947. In 1947, as a result of a winning roll of the dice, a cross-transfer of petitioner's 1946 Ford for the losing player's 1946 Chrysler was effected. The gambling gain thereby realized by petitioner and reportable as income by him was $1,797.17. The amount of that gain was determined by respondent as the difference between *164 the undepreciated costs to petitioner and the losing player of the two cars. Since the Chrysler was purchased only 6 days before the transfer, whereas petitioner's Ford was bought over 2 months prior thereto, the respondent's failure to take depreciation into account worked in petitioner's favor. We, therefore, sustain respondent's determination. As has already been noted, respondent in his determination of the deficiencies for 1948 and 1949 has added to petitioner's percentage share of the gambling profits a salary of $15 for each day worked. He has determined that petitioner worked 306 days in 1948 and 313 days in 1949 and has added to the income reported by petitioner on his returns, $4,590 for 1948 and $4,695 for 1949. Petitioner in his testimony denied that he received any daily wages during any of the time that he worked for McCoy from the time he began work in 1945 down through the year 1949. His testimony was to the effect that he was to receive from 15 to 25 per cent of the net profits of McCoy's gambling business and was to be guaranteed a salary of at least $3,000 per annum. After a careful consideration of all the evidence we have concluded that petitioner did not receive *165 a daily wage of $15 a day from McCoy and the Commissioner's determination to that effect for 1948 and 1949 is not sustained. Fraud Penalties 1945-1946 Respondent determined 50 per cent fraud penalties against petitioner for each of the tax years in issue. Section 293(b), I.R.C. In a civil suit respondent must prove fraud by clear and convincing evidence, that is, respondent must show that petitioner intentionally evaded a tax believed to be owing. Section 1112, I.R.C.; Wiseley v. Commissioner (C.A. 6), 185 Fed. (2d) 263. What constitutes fraud is a question of fact which must be decided on the basis of all the conditions and circumstances surrounding the transaction. Wallace H. Petit, 10 T.C. 1253; William W. Kellett, 5 T.C. 608. After a careful review and consideration of the evidence, we have found that part of the deficiencies which the Commissioner has determined against petitioner for the years 1945 and 1946 was due to fraud with intent to evade tax. The evidence shows that up to June 4, 1945, petitioner was employed by Bechtel-McCone Corporation and received $2,257.48 in wages. He received a withholding receipt from his employer showing "Federal Income tax withheld, $291.30." *166 He filed this Form W-2 as his income tax return for the year 1945. It was filed by him January 12, 1946, and in it is stated "All my 1945 income is reported herein." Notwithstanding the above statement that all his income for 1945 was included, we have found that after petitioner went to work for McCoy in June 1945, he made cash deposits in his bank account with Exchange Bank of Birmingham, Alabama, of $2,350. Petitioner admitted in his testimony that he received the money representing the foregoing deposits from McCoy but he claims these amounts were given him by McCoy. It seems clear to us that the cash payments which McCoy made to petitioner in 1945 after he entered McCoy's employ were not gifts but were compensation payments made to petitioner for his services as an employee. Petitioner impressed us as a man of intelligence and he must have known that these payments represented taxable income and did not represent nontaxable gifts. We have, therefore, made a finding that part of the deficiency against petitioner for the year 1945 is due to fraud with intent to evade tax. For 1946, petitioner filed his return on Form 1040 and reported thereon $3,924.09 as having been received from *167 McCoy. We have held that this return was correct so far as it went. But we have found that in 1946, petitioner received from McCoy $2,202.83 which he used in the purchase of, first, a Ford automobile for $1,422.34 and then later $780.49 to pay the difference when the first Ford purchased was traded in for a Ford Sportsman's convertible. Petitioner omitted this $2,202.83 entirely from his income tax return for 1946. He claimed at the hearing that the $2,202.83 was given him by McCoy and it was for this reason that he did not report it as taxable income. For the same reason, which we have already stated as to the $2,350 bank deposits omitted from petitioner's return in 1945, we find ourselves unable to accept petitioner's explanation of why this $2,202.83 was omitted from his 1946 return. We have, therefore, made a finding that part of the deficiency against petitioner for the year 1946 is due to fraud with intent to evade tax. See M. Rea Gano, 19 B.T.A. 518, 533. In the Gano case, we said: "A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences *168 a fraudulent purpose." Fraud Penalties 1947, 1948 and 1949 We have made a finding of fact that "petitioner's deficiencies in income taxes for the years 1947, 1948, and 1949 were not due to fraud with intent to evade tax." The deficiencies for 1948 and 1949 were largely based upon the Commissioner's determination that there should be added to the income reported by petitioner on his returns, $4,590 for 1948 and $4,695 for 1949, as representing $15 a day wages received by petitioner in those years from McCoy. We have found that petitioner received no daily wages from McCoy during any of the period which he worked for him, including 1948 and 1949. Our finding of fact to that effect eliminates those amounts from the Commissioner's determination. It was because of these additions to petitioner's income for 1948 and 1949 that the Commissioner asserted fraud penalties. With our reversal of the Commissioner's determination of these additions to petitioner's income, the fraud penalties fall with it. We have sustained the Commissioner as to his additions to the income reported by petitioner on his 1947 return. However, we do not think the Commissioner has sustained his burden of proving by *169 clear and convincing evidence that these omissions were due to fraud with intent to evade tax. Therefore, the Commissioner's determination of fraud penalties for 1947 is not sustained. Statute of Limitations Petitioner contends that the assessment of deficiencies and penalties for 1945, 1946, 1947, and 1948 is barred by the three-year statute of limitations in section 275(a) of the Code. However, since we have held that petitioner's deficiencies for 1945 and 1946 were due, at least in part, to fraud with intent to evade tax, there is no statutory bar upon the time for assessment of those deficiencies or the penalties here in question. Section 276(a) of the Code. [3] For the year 1947, we have found that the return was not fraudulently filed with intent to evade the tax. Consequently, section 276(a) of the Code would not be applicable. However, the statutory deficiency notice for 1947 was mailed within five years after the return for that year was filed and petitioner omitted from his return for that year gross income in excess of 25 per cent of the amount of gross income reported therein. Consequently, the five-year statute of limitations prescribed in section 275(c) of the Code [4] is *170 applicable to that year. The statute of limitations has, therefore, not barred the deficiency for 1947. Petitioner's return for 1948 was filed January 21, 1949, and the deficiency notice applicable thereto was mailed July 28, 1952. Therefore, more than three years had elapsed between the filing of petitioner's return for 1948 and the mailing of the deficiency notice. The three-year statute of limitations is consequently applicable and bars any deficiency for 1948. Section 275(c) *171 of the Code is not applicable to 1948 because petitioner did not omit from his 1948 return in excess of 25 per centum of the gross income stated in his return. In fact, we have found that his return for that year correctly reported his income. Petitioner does not claim that the statute of limitations has run as to 1949. Estimated Tax Penalties Respondent contends that petitioner is liable for penalties for failure to file declarations of estimated tax for the years in issue and for underestimation of estimated tax. For the 1945, 1946, and 1947 taxable years the provisions of section 58(a) of the Code (as amended by section 13(a), Individual Income Tax Act of 1944) require an individual to file a declaration of estimated tax if (1) his gross income from wages "can reasonably be expected" to exceed $5,000 plus $500 for each exemption (except his own) provided in section 25(b), or (2) his gross income from sources other than wages "can reasonably be expected" to exceed $100 for the taxable year and his total gross income to be $500 or more. [5] The provisions of section 58(a) applicable to income from wages for 1948 and 1949 require a declaration to be filed if gross income from wages "can *172 reasonably be expected" to exceed $4,500 plus $600 for each exemption (including the taxpayer's own). Revenue Act of 1948, section 202(a). The declarations are required to be filed by March 15 of the taxable year or, if it does not then reasonably appear that sufficient income will be received to require the filing, by either the following June 15, September 15, or January 15, whichever date next succeeds the time it first reasonably appears that such income will be received. Section 58(d)(1), I.R.C.
If sufficient income is received but no declaration is filed, the taxpayer is subject to a maximum cumulative penalty of 10 per cent of his correct income tax (reduced by the income tax actually withheld from his wages) for the particular year, unless he can show that his failure to so file was "due to reasonable cause and not to willful neglect." I.R.C., section 294(d)(1)(A).[6] *174 In addition, he is subject to a penalty of 6 per cent of his correct tax (reduced by *173 the income tax actually withheld from his wages) for substantial underestimation of estimated tax. I.R.C., section 294(d)(2); Regulations 111, section 29.294-1(b)(3)(A); [7]G. E. Fuller, 20 T.C. 308. "Reasonable cause" is no defense to imposition of the section 294(d)(2) penalty. H. R. Smith, 20 T.C. 663. Petitioner, in this case, failed to file declarations of estimated tax for any of the years in issue or to pay any installments of estimated tax. He was entitled to exemptions, under section 25(b) of the Code, *175 for himself, his wife and two children. In 1945 and 1946, his income was derived entirely from wages and was $4,866.06 and $6,126.92, respectively. Since those earnings did not exceed $6,500 ($5,000 plus $500 for each exemption other than his own) he was not required to file a declaration of estimated tax under section 58(a) and, therefore, is not liable for penalties under sections 294(d)(1)(A) and 294(d)(2). In 1947, petitioner's wages in percentage of profits of $6,606 exceeded the aforementioned $6,500. In addition he realized a gambling gain of $1,797.17 in trading his Ford for a Chrysler, which classifies under section 58(a) as income in excess of $100 from sources other than wages. In 1948 and 1949, his income was entirely from wages in percentage of profits and did not exceed $6,500 in either year. Consequently, petitioner was required to file a declaration of estimated tax for 1947 under section 58(a) of the Code, as amended. He was not required to file declarations of estimated tax for the years 1948 and 1949. He has introduced no evidence showing reasonable cause for his failure to file such declaration for the year 1947 and is, therefore, liable for the penalty provided *176 in section 294(d)(1)(A). In addition, petitioner is liable for the section 294(d)(2) penalty for underestimation. For reasons already stated, he is not liable for these penalties in any other year except 1947. Decisions will be entered under Rule 50. Footnotes
1. "C.A." and "Charles A" Lux are the same petitioner.↩
2. When questioned on cross examination about the deposits to which reference is made above, the petitioner replied "They were gifts from McCoy for running errands for him." At this point the following questions and answers occur in petitioner's testimony: Q. Let's go into detail about this business of running these errands. What did these errands consist of? A. Collecting checks for him, making bank deposits for him, calling customers for him. Q. In other words, you were working for Mr. McCoy on a part time basis? A. Well, you could say I was working for him, but I really wasn't. Q. We can say it but let's mean it when we say it. Were you working for him or were you not working for him? A. Yes, I was. In view of the foregoing testimony and other testimony in the record we have made a finding of fact that $2,350 of the bank deposits which petitioner made to his personal bank account in 1945 represented wages he had received from McCoy.↩
3. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. ↩
4. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
5. "Wages" are defined in section 1621(a) of the Code as "* * * all remuneration * * * for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash; * * *"↩
6. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - (1) Failure to File Declaration or Pay Installment of Estimated Tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35. 7. Internal Revenue Code. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser, * * * Section 29.294-1(b)(3)(A) of Regulations 111 reads as follows: "* * * In the event of a failure to file the required declaration, the amount of the estimated tax for the purposes of this provision is zero."↩